Good morning, everyone. This is Judge Nardini. I am joined here on the bench today to discuss virtually by Judges Walker and Raggi. Thank you all for being with us on this very snowy day. I hope that you're all safe and warm inside somewhere and you're not trying to Zoom from outdoors. We're sorry that we can't be with you live at our courthouse in New York. Hopefully we'll be returning there soon enough. But in the meantime, I'm grateful for your patience as we connect with each other virtually. A couple words about technical issues. If for some reason your connection fails or there's some technical glitch, please don't panic. If you get off the call, just try to log back on. Our courtroom deputy stands at the ready to help you. We will pause and wait for you to come back. If there's a lengthy delay, we will simply put your case on pause, move to the next case in the calendar. And when you're back and connected, we will resume your case wherever we left off. And have no fear, we will reset the clock so you will not lose any time. But we do have some technical issues from time to time. So certainly we won't hold that against you. And if we fall off, we hope you don't hold that against us. The way we will proceed today is that we will call the cases in order. At the outset, we will give the litigants two minutes of uninterrupted time. After which we will proceed with open to questioning. I will be inviting the other judges to just jump in with questions after that two minutes is up. You should see your clock in the corner of your Zoom with the minutes ticking down. And as I call your case, I'm just going to be confirming how much time you have asked, if you're the appellant, to reserve for rebuttal. You don't have a warning light. So if you can't see that little clock, I would encourage you to have some sort of egg timer or some other timer there just to monitor what time you've got. So why don't we proceed? I understand from Mr. White that everyone has logged in, so I won't call the whole calendar first. So why don't we start with the first case, which is docket number 20-1193. And I'm going to ask appellant's counsel for help pronouncing his client's name. I think it's Myo versus Oppenheimer and Company. So, Mr. Is it Lekul? Yes, Your Honor. And did I pronounce your name properly? You did pronounce my name properly, and my client's name is Wynow. Wynow. Okay, thank you very much. And then for the appellee, we have Mr. Gibson. Yes, good morning, Your Honor. Okay, great. So you can both see and hear us, I trust? Yes, yes. Okay, let's see. So, Mr. Lekul, looks like you will have eight minutes to begin, and you've reserved two minutes for rebuttal. Is that right? That's correct. Okay, so why don't we kick it off there with Mr. Lekul. Go ahead. Good morning, Your Honors. My name is Valdi Lekul. I represent the plaintiff appellant, Mr. Noe. The district court here erred in both compelling arbitration and then denying Mr. Noe's motion to vacate that arbitration award. With respect to the first issue, the threshold issue of compelling arbitration, New York law is clear that an agreement to arbitrate must be clear, explicit, and unequivocal. If it requires implication or subtlety, there is no agreement to arbitrate. And the New York Court of Appeals is equally clear that a handbook, that a disclaimer, a no-contract disclaimer within a handbook is dispositive, holding that there is no contractual intent. In this particular case, there was a handbook that repeatedly said it is not a contract, it represents guidelines and general reference guide only. New York law makes clear that this is dispositive here. There can be no express or implied contract as a result. And as the New York Court of Appeals held in Lubasco, this prevents the creation of a contract. That disclaimer cannot be overcome by implication or implied, in fact, contract. In fact, the text of the operative documents makes that clear. Mr. No signed an acknowledgment form in connection with the handbook. That acknowledgment form, which is on page 114, states this handbook is not a contract of employment, express or implied. That means that you cannot have a contract by looking to the layout of the document to see if there are sections that are distinct, by looking to the mandatory nature of its language, or by conduct. More importantly, perhaps, the disclaimer of no express contract means that Mr. No could not sign pages of that document saying I agree that this is a contract. Neither one of those is permissible. Mr. McCall, on that last point, you said he couldn't sign pages saying it's a contract. I'm looking at page 61 of the joint appendix, which appears to be a document, an electronic signature through Adobe, with two acknowledgments. That's one, understanding and acknowledging the handbook. And I understand your argument that the handbook can't be a contract. But it independently says I agree to the terms of the arbitration agreement. So don't we have a very different situation here? The arbitration agreement was a standalone document, and he agreed to it. The fact that it's cross-referenced in the handbook doesn't seem to be something that could make it less binding. Well, it's not just that it's cross-referenced, Your Honor. It's literally signing pages of the document of the arbitration agreement. The only place the arbitration agreement lives is on pages 28 to 32 of the handbook. And if you look at page 114, which is the acknowledgment form, that's the acknowledgment form that Mr. Noh signed in connection with page 161. That is the language that says this is neither express nor implied contract. But perhaps more importantly, Your Honor, this situation is undoubtedly messy. We have interlocking documents, two of which are signed, that appear to point in different directions. A handbook that says it's not a contract. A signature that says I agree to the arbitration agreement. And a separate acknowledgment that says this is not a contract. I'm sorry, Judge Roger, you're muted. Can you hear me now? Yes, thank you. I'm sorry it took a little effort to do that. I wanted to take you back a moment to the offer letter that your client signed. I think that's August 18, 2009. There are any states that he agrees to resolve any claim arising from his employment by arbitration. Why isn't that also reflective of an arbitration agreement? Well, Your Honor, Oppenheimer has not argued that. Did not argue it below nor before the district court. Well, can you answer for me why it's not? Well, Your Honor, I would argue that it's not because of the subsequent disclaimers in the handbook. Because the only place that the terms of arbitration are set forth is in the terms of the handbook. So pages 28 to 32 are the logistics of arbitration, so to speak. And so you need to combine those two. So, again, you have something that indicates that it could be a contract and something that indicates that it is not. And, again, New York law says under those circumstances we do not have a contract. Judge Walker, isn't it perfectly reconcilable to have a handbook that is not binding and to which the disclaimer applies, but to have an agreement within the handbook separately signed that is a contract? Why is there any confusion over that? It seems to me that, as you point out, the handbook itself is not a contract. But we're not talking about the handbook. We're talking about the arbitration agreement. Because, Your Honor, the arbitration agreement is literally labeled as part of the handbook, and the acknowledgment that this is not a contract applies to the entire handbook. Well, if the arbitration agreement were a separate document, you know, perhaps an exhibit to the handbook or perhaps not even an exhibit, a separate document, you wouldn't have an argument, would you? Correct, Your Honor. That's correct. Why does it change just because it's within the handbook itself? It's still a separate instrument, isn't it? It is not, Your Honor, because what he is signing are literally pages of the handbook. It would be the equivalent. Let's say there was a progressive discipline policy in the handbook. If he initialed those pages, would that mean that that's a contract? I think New York law would say that it is not a contract. And, again, agreed, we have different permutations here, but the clarity with which Oppenheimer must prove that it's a contract requires there to be no implication. We would have to read out the disclaimer that says that the handbook is neither an express nor implied contract in order to convert these pages into a contract. In other words, as I understand Oppenheimer's position, this is an express contract because pages 28 to 32 are signed. Well, the disclaimer says you cannot have an express contract. So we have two things going on at the same time, a document that purports to be a contract and not a contract at the same time. And under well-settled New York law, that means we defer to the no-contract rule. And so I will reserve the rest of my time. Thank you, Your Honor. Thank you, Mr. LaCoulle. Mr. Gibson, you have ten minutes. Good morning. May it please the Court, I am Michael Gibson on behalf of the appellee Oppenheimer & Co, Inc. And the appellant's argument fails for two reasons. First, the argument ignores the fact that the appellant, who holds a law degree and a certification in European arbitration, as the Court has noted, agreed three times in writing to arbitrate his disputes with Oppenheimer. He did so within his offer letter. He did so within a separate document titled Arbitration Agreement that he signed the day he started working for Oppenheimer. And he did so a third time in November of 2014 when he electronically affirmed, first, having received the 2014 handbook, and then, as Judge Nardini pointed out, separately affirming, yes, I agree to the terms of the arbitration agreement. And those three agreements are separate, they're distinct, and by their terms are entirely mandatory. And the appellant here has been unable to point to a single authority in this circuit where a court has refused to enforce a separate, distinct, mandatory arbitration agreement simply because an accompanying employee handbook provides that that particular policy does not create a contract of employment. And as the District Court noted, the Lobosco case and the other authorities cited to by the appellant is fundamentally different because there was no separate, distinct agreement to arbitrate. And it's also important to note, Your Honors, that both versions of the employee handbook that Mr. Noh points to provide very clearly that the terms of the handbook do not affect any separate written agreements between the employee and Oppenheimer. And that if there were any conflicts between a separate agreement and the handbook, that the terms of the written agreement would apply. Now, finally on this issue, Your Honor, even if this case were in line with the authority cited to by Mr. Noh, where you weren't dealing with a separate, distinct arbitration agreement, but rather an arbitration clause that was buried within the terms of an employee handbook, his argument still fails. And that's because District Courts in the circuit have held that even under those circumstances, where you have an employee handbook with limiting language, if there's an arbitration clause that makes clear that its terms are mandatory and the employee's employment is subject to that agreement to arbitrate, the employer can still enforce that arbitration clause. And two such cases are Brown v. St. Paul's Travelers and Isaacs v. OCE Business. And if you look at the first line of both the 2009 arbitration agreement and the 2014 arbitration agreement, it starts, Your employment with Oppenheimer and Co. Inc. is subject to your agreement to a pre-dispute arbitration clause. And in fact, further down it says, In consideration of my employment or continued employment, I agree to arbitrate. There is no such limiting language in any of those agreements. As such, I believe the District Court got it right that the court was proper in compelling arbitration, and unless the panel has any questions for me, I will move on to the order denying motion to vacate. And to that end, it's well settled that a party must meet a very high burden in order to vacate an arbitration award on the grounds of manifest disregard. As this court held in DuFerco Steel, that burden is only met in exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent. And I also respectfully submit that it's not enough for the court to disagree with the holding of the arbitrator. Rather, as this court held in TECO Metals, the award must be enforced, quote, if there is a barely colorable justification for the outcome reached. And here, Your Honors, not only did the arbitrator, a retired United States magistrate judge, have a colorable justification for his finding which dismissed Mr. Nill's claims, he had a robust factual record supporting his finding. And as the District Court held, Mr. Nill's motion to vacate the award is in fact an impermissible challenge to those factual findings. And most importantly, the factual finding that Mr. Nill had his supervisory responsibility removed on July 14, 2014, which was before he ever went on an FMLA leave of absence and was before he ever indicated that he wished to take an FMLA leave of absence. The evidence reflected that Oppenheimer, on multiple occasions, made Mr. Nill aware of what his rights were insofar as taking up to 12 weeks of unpaid FMLA leave for the birth of his child. And there was evidence, including the testimony of Mr. Nill's supervisor and two of his coworkers, which was credited by the arbitrator in his award, that Mr. Nill elected not to take an FMLA leave for the birth of his child and instead desired to work remotely and to continue to get paid, which he in fact did. So can I just ask you to clarify? You've said a number of times that he didn't ask to go on FMLA leave. Is it your position that he asked to go on some other form of leave, or is it—you're saying that he just was working remotely and wasn't going on leave at all, right? Isn't that what I understand your argument to be? Exactly, Your Honor. Before Mr. Nill deported for California for the birth of his child, he spoke to Human Resources. Human Resources pointed him to the employee handbook, which provides Oppenheimer's FMLA policy and the procedures that must be followed in order to follow that—to obtain FMLA leave, which is unpaid under Oppenheimer's policy. Mr. Nill, in discussions with his supervisor, Mr. Roentgel, and his coworkers, decided, I do not want to go on an unpaid FMLA leave. I'm going to go to California, I'm going to work remotely, and I wish to continue to be paid. But again, can I just ask you—again, you've said that a number of times. He has not—he did not ask to go on an FMLA leave. Are you suggesting that he asked to go on a different form of leave? No leave at all, Your Honor. Okay, so when you keep saying FMLA leave, I keep wondering whether you're trying to make a distinction between, yes, he wanted to go on a leave, but it wasn't technically the kind of leave that falls under the FMLA. And again, I thought your argument was, he didn't ask to go on leave at all. He just asked to work from San Francisco. That's exactly right, Your Honor, and I apologize if I'm confusing— if I'm—if I was confusing in that matter. Mr. Nill was working remotely from California and getting paid, never once called up Oppenheimer or emailed Oppenheimer and said, wait a second, why am I getting paid? I'm on a leave. In fact, to the contrary, subsequent to the July 13th, 2014 email, which Mr. Nill unsuccessfully argued was somehow his notification that he was going on an FMLA leave, an email that didn't reference the FMLA, didn't reference a leave of absence, didn't request time out of the office, simply said, I'm not coming back until August 25th. Days after sending that email, Mr. Nill sent an email to his colleague offering to take on additional remote work responsibilities. And the two recipients of that July 13th, 2014 email, neither of whom was authorized to approve an FMLA leave or disapprove one, even if it could constitute a request, both testified that they understood that email to be Mr. Nill simply stating that he was going to unilaterally continue the status quo, i.e. working remotely from California, which he continued to do and continued to get paid. Now, several weeks later, Mr. Nill suffered a brain aneurysm in mid-August of 2014. And it was at that point that he did go on an FMLA leave, that he did come off Oppenheimer's payroll. But Mr. Nill's supervisory responsibilities, the adverse employment actions at issue here were removed weeks earlier. And when Mr. Nill came back to work at Oppenheimer in November of 2014, he was returned to the same exact job title with the same exact salary that he had when he went on an FMLA leave in August of 2014. In fact, Mr. Nill was making the same $150,000 base salary when he was terminated by Oppenheimer a year and a half later in June of 2016 that he was making the day that he went to California in June of 2014 for the birth of his child. The only reduction in compensation that Mr. Nill incurred was reduction in two discretionary production-based bonuses, annual discretionary production-based bonuses, which the arbitrator relied on well-settled law that an employer is entitled to take into account time out of the office, including time out on FMLA leave when awarding discretionary production-based bonuses. And then finally, the award, there was a factual basis for the finding that a year and a half after his FMLA leave, Mr. Nill was terminated by Oppenheimer. And he was terminated at a time when Oppenheimer had just suffered two of its worst financial years in recent history, including the financial crisis. And more importantly, there was evidence that Oppenheimer had ceased doing business altogether in the industries that Mr. Nill was a research analyst for. And in fact, Oppenheimer never hired any research analyst to replace coverage for those sectors. And for those reasons, I respectfully submit that the opponent has not come close to establishing that this award qualifies as one of the exceedingly rare circumstances where an award should be vented on the grounds of manifest disregard for the law. Thank you very much. Thank you. Mr. LaCoult? Yes, Your Honor. Is there two minutes for rebuttal? Yes, thank you. We are not challenging the arbitrator's findings of fact even though we may disagree with them. We are challenging the standard used by the arbitrator to determine when FMLA protections kick in. The arbitrator repeatedly looked for Mr. Nill to either request or be placed on leave before he found that the FMLA protections kicked in. In fact, this court has made clear that the protections of the FMLA kick in when the employer has reason to know that the FMLA may apply. And in this case, that July 13th email has all of the necessary elements to let Mr. Lowenthal know that the FMLA may apply. Mr. Nill stated that his daughter was two weeks old, that she had a health condition that prevented her from traveling, and that he would, quote, be back in the office by August 25th. You don't need to be clairvoyant to think that the FMLA may apply here. And it is undeniable that Mr. Lowenthal then demoted Mr. Nill because of that July 13th email. In fact, only a few days later, he sends Mr. Nill FMLA papers and admits that the reason for stripping Mr. Nill of his responsibilities, which the arbitrator found was in fact an adverse action and a demotion, was because of the leave, Your Honor. And so it is the case. Counsel, this is Judge Walker. Your adversary made the point that he continued working during that period of time. How is that consistent with getting FMLA leave? Well, no, Your Honor. He did not continue working, Your Honor. He was already demoted. That's not inconsistent with working. He was working. He still had his computer. He was working, and he didn't have the authority that he had before. He still had work. And he was working and earning money during that period of time. But by that point, he is demoted. It is inconsistent because once he sends the July 13th email, the adverse action is stripping him of his supervisory responsibilities. That completes the violation because it's at that point that the employer took an adverse action because of a situation in which the FMLA may apply. That's not what I'm asking. I'm asking the question, the fact that he continued working at whatever level, with whatever supervisory or lack of supervisory responsibilities he may have had, is inconsistent with taking FMLA leave. And you're arguing that his FMLA leave started in July. No, I'm sorry, Your Honor. I'm not arguing that. I apologize. What I'm arguing is that Mr. Lowenthal was prohibited from taking an adverse action in response to the July 13th email. It matters not that Mr. Noh continued working. What matters is that he gave Mr. Lowenthal sufficient information to let Mr. Lowenthal know that leave may apply. In response to that notification, Mr. Lowenthal took an adverse action, which is a demotion. I understand that part. I'm still a little confused about how it's consistent with, in effect, his intent to have FMLA leave for him to continue working. Well, Your Honor, respectfully, the point is that the trigger for FMLA protection doesn't require him to specifically ask for FMLA leave or even take it, just to provide sufficient notice that it may apply. And so that's our argument. I apologize if I was confusing you in my answer. All right. Very good. Thank you to both counsel. That was very well argued. We thank you for your assistance. And we'll take the case under advisement. Thank you, Your Honor. So let's turn to the next case on the calendar, which I believe is United States v. Cooney. And do we have both counsel ready? Do we have Ms. Notari? Yes, Your Honor. And do we have, let's see, Attorney Nakei. And I'd like you to tell me if I'm pronouncing, how should I pronounce your name? I don't want to get it wrong. Thank you, Your Honor. Good morning. It's Nagar Peckier on behalf of the United States. Okay. Thank you very much. So Ms. Notari, I understand you've reserved two minutes for rebuttal. So if you would like to proceed. Your Honor, just one moment. I don't see my video. Do you see my video? No, not yet. We'll wait for you to get on video. I'm trying to. The game clock is paused while you're getting your video. Don't worry. I'm not sure why it's not clicking. My experience is that sometimes you have to reboot the whole computer in order to perpetuate this. You're not on some sort of remote visual, remote platform, are you, apart from just the computer itself? I'm not. We did see you just a second ago. What I will say is that we're also perfectly prepared to hear your argument even without the video. Okay. We could do that. I'm fine with that. Why don't we proceed that way? I think that we'll be able to work just fine. We often do this by telephone conference call, and I think we have no problem understanding arguments. So can you see us and can you see the timer? Yes, I can. Okay. Why don't we go forward and try it that way? Okay. Your Honor, may it please the Court, Your Honor, good morning. My name is Paula Nishihara, and I represent Defendant Appellant Bevin Cooney. Your Honor, we are challenging that the record below does not support a finding with sufficient clarity for appellate review regarding the restitution in this case, which was the standard is very clear that both the Mandatory Distance Restitution Act and the law's guidelines, which apply with the same effect. The requirements under Chapter 2, just like the MVRA, requires that there must be a sufficient causal relationship between the defendant's fraudulent conduct and the loss to the victims. There must be a proximate causation, which not only shows that the defendant's fraudulent conduct caused the victim's loss, but also in the case of, in this case, the co-conspirators, that their actions were reasonably foreseeable to the defendant in this case. This case was incredibly complex. It was a six-week trial. And what further links the complexities here in the court's findings is that the judge, Judge Abrams, the district court, rendered a 60-page opinion, which essentially exonerated the co-defendant's defendant, Archer's, conduct. The reason why this is complex is because, essentially, Mr. Cooney and Mr. Archer's conduct as charged in the indictment regarding counts 1 and 2 were essentially the same conduct. They both purchased the defendant's watch. I think the two-minute limit is a rough one. Okay. My question, Judge Abrams ruled in Archer's favor post-verdict, but expressly did not rule in Cooney's favor post-verdict. And her decision in Archer was reversed by the Second Circuit. So I don't understand these arguments. I mean, it was a complex case. It was a lengthy trial. But Mr. Cooney's involvement was right from the get-go when they were looking for money through these various tranches of sales of the bond that were made. And, you know, he was in with Golas, Jason Golas. And it seems to me that he was ‑‑ it's not like he joined this conspiracy late in the process. He was there from the beginning. And, therefore, it seems to me that the full restitution of the $43 million is appropriate under those circumstances. Your Honor, I'm glad you bring up the timing because, respectfully, the problem with the court's record is the court was very undecided in many of these issues, specifically including when Mr. Cooney joined the conspiracy. If you review her opinion in the Rule 33 as it applies to Mr. Cooney and also if you review her opinion at the sentencing hearing, she specifically says that she's not certain as to when Mr. Cooney joined the conspiracy because she specifically found that Mr. Cooney and Mr. Archer's purchase of the second tranche of bonds alone was not the positive evidence of Mr. Cooney's guilt. Judge Abrams went on to make it clear. No, but that's the second tranche. The first tranche was the $28 million. And the $28 million was ‑‑ Cooney was there. He was talking about ‑‑ they were talking about discretionary liquidity, a honey trail, excess honey. And then he made the comment about, you know, the West Coast charging down the field when Hughes would take the bond. So, you know, it seems to me ‑‑ I don't see how you can argue that he wasn't involved all the way through. There was a difference between Archer and Cooney in one sense, and that is that Archer ‑‑ the case against Archer depended on circumstantial evidence primarily. And he wasn't involved in all the conversations with Jason Galanis. But you're not arguing here anywhere that there was insufficient evidence against Cooney here. You're just arguing that we'll accept all the evidence against Cooney, but somehow he's not responsible for restitution. I just don't follow it. I mean, I do follow part of it. Obviously, the government concedes certain parts that some of the restitution order needs to be adjusted. Your Honor, first I would note that the e‑mail communications that you're relying upon, specifically Judge Abrams' call that she agreed that those communications, essentially in their entirety, were socially innocuous. Or she said they were at best most naturally subject to innocent interpretation. She even cited, in her opinion, exonerating Archer, an e‑mail by Mr. Cooney indicating that he did not know the purpose of what the monies were going towards. And this is what she relied upon, exonerating. So she went through all of those discretionary liquidity e‑mails. She went through every single one of them. There was not one e‑mail which she felt was dispositive evidence of guilt. She specifically held that that evidence was innocuous. And she went on. But in the end, she concluded that together the evidence was sufficient to demonstrate your client's ability to foresee these losses. So I'm not sure why we would take evidence piece by piece as opposed to review the district court's ultimate conclusion. So what I think, what I'm asking the court to do, respectively, is the court, Judge Abrams specifically, in the end, she focused on three categories of evidence, which she felt was evidence of Mr. Cooney's, that convinced her that there was sufficient evidence of his fraudulent conduct. And if you look at those three categories, which she very specifically defined, those categories had to do with, one, his receipt of monies from the WAPC account. Two, his submission of what she considered a backdated form to the SEC, referencing it as a fake entity notice caliber. And three, his purported loss to City National Bank involving a loan he received. If you look at those three categories, those three categories are not, this was all other act evidence. This was 404B evidence that was admitted. And none of these acts, which connect to Mr. Cooney, are connected to the victims in this case. The victims, there was two, the defense's position is that there were two conspiracies. The only counts relating to Mr. Cooney were the counts where he purchased the second tranche of bonds with the WLC State. He was not involved in 2012, 3, and 4. He was not, there was clear evidence that he had nothing to do with the victims. He never met the victims. He never, he had no board position. He was a passive investor. And if you simply isolate the conduct, there's no causal connection between his conduct and the loss that was suffered by the victims. For example, the fact that he lied to his bank to get a loan in January of 2015 has zero to do with the victims in this case. There's no way that you can say by lying to a bank to get a loan that somehow that conduct resulted in either actual or intended loss, that it was reasonably foreseeable for him to lie to his bank to believe that somehow that lie to a bank on a loan caused losses to the funds here, to these Atlantic investors. Counsel, you've reserved two minutes for rebuttal. If you'd like, you may use some of that time now. Or if you prefer, you could reserve it. Thank you. I would love to reserve it. Thank you very much. Let's hear from the government. May it please the court. My name is Nagar Tekia, and I'm an assistant United States attorney here in the Southern District of New York. I represent the United States on this appeal. And I also represented the United States in the proceedings below. The defendant, Bevan Cooney, participated in a scheme to defraud two sets of victims, as Judge Walker has already noted this morning. First, he victimized the Wachtomney by inducing it to issue $60 million worth of tribal bonds, the proceeds of which he and his co-conspirators used not for an annuity that they had promised the Wachtomney would fund economic development projects, but for their own personal use and to help build a financial services conglomerate that they would control and that they hoped to sell for profit. Second, he victimized 10 pension funds, all of which were clients of asset managers that Cooney and his co-conspirators acquired by investing their money in Wachtomney bonds, and then, among other fraudulent actions, misappropriating client money for their own purposes. After a six-week trial, a jury found Cooney guilty of conspiracy to commit securities fraud and securities fraud. Cooney does not challenge that conviction here. At sentencing, after having presided over the trial, having made specific post-trial findings that Cooney was a willful participant in the scheme, having reviewed the pre-sentence investigation report and victim impact statements, and having made specific findings with respect to the loss amount and number of victims at a thorough sentencing proceeding, the district court was well within her discretion to hold that Cooney, for the reasonably foreseeable acts of his co-conspirators, victimized Wachtomney and 10 pension funds and was well within her discretion to hold him liable for restitution to all of the victims. As the district court held in post-trial rulings and at sentencing, quote, ample evidence, end quote, demonstrated that Cooney was a willful participant in the scheme. That evidence, including what Judge Walker has already outlined this morning, included the following. Cooney's receipt of $5 million in misappropriated bond proceeds that had been taken from investment advisor clients, the pension fund victims in this case, which Cooney used to purchase $5 million worth of additional Wachtomney bonds, making Wachtomney believe that there was, in fact, a market for the sale of these bonds when there wasn't. Cooney's receipt of $3.895 million directly from the fake annuity provider, followed by his false statements to his accountant about the source of those funds. Cooney's receipt of an additional $75,000 directly from the fake annuity provider's account, comprising funds misappropriated from another pension fund victim, and Cooney's use of fake backdated documents to conceal his receipt and misuse of bond proceeds funneled through the fake annuity provider account. In holding Cooney liable for restitution to the pension fund victim, the district court specifically held that the government had established that Cooney knew the pension fund's money had been misappropriated and that the restitution order should, therefore, encompass these loss amounts. Can I ask you to direct your attention to the concession in your brief regarding what you recommend to be the adjustment that we should make to the restitution order with respect to the Wachtomney? Yes. Could you just explain, I assume that that's simply an error that the government noticed in the course of preparing its brief? Yes, Your Honor. It was not, Mr. Cooney did not object to that specific amount of sentencing in preparing our brief and reviewing the victim impact statement provided by Wachtomney, as well as reviewing the restitution orders already entered against Cooney's co-defendants in this case. We realized that a portion of the Wachtomney victim impact statement included funds that were expectation damages. In other words, not money that Wachtomney had incurred as losses already in connection with the scheme. And therefore, as we concede in our brief, and the court has the power to modify the restitution order in this regard, the amount owed to Wachtomney should be $150,000. Can I ask you, I suppose as a technical procedural question, your brief suggests that we exercise our authority to modify the restitution judgment ourselves. Is there some procedural advantage or disadvantage to our doing it ourselves, as opposed to vacating the restitution order in that limited regard and directing that the district court enter a modified judgment upon the record? Your Honor, because the court is empowered to do so, and rather than create additional, for lack of a better term, work for the district court to amend the order. Since the court is empowered to do so, then that's why we ask this court to modify the restitution order as part of its judgment on appeal. I'm sorry, Judge Walker. No, go ahead. Well, if we do that, how does it get on the district court docket? What does the docket entry look like on the district court? Because people will look for that and want to see what the judgment is. It's got to be amended on the district court docket somehow. Now, I assume that our order would somehow be communicated and entered in the district court docket. Is that accurate? I think that's accurate, Your Honor. In, and I'm going to mispronounce it, Jijija, the case that's cited in our brief, this court simply modified the award to reduce it to the amount that the defendant had pointed out to, to reduce the amount that the defendant in that case had pointed to as the amount in error. Sitting here today, I'm not exactly sure how that was reflected on the docket of that case. I suppose what we could do is, as part of our order, direct that the district court make appropriate adjustments to its docket to reflect this development. That's certainly the case, Your Honor. One half does or the other is whether we send it back or do it ourselves. Can I also ask, and maybe this is going to be a question for the next case, whether the government is making a similar concession in Golanus, and what are you planning to do with all of the other co-defendants whose judgments I presume have become final? And I don't know that there are appeals pending in those other ones. So, but I assume that this is an issue that would apply across the board to all the defendants. And maybe some of them are out of luck. Maybe their judgments are final. And maybe it's a moot point, you know, given the vast dollar amounts involved in restitution. But I worry that if, you know, some of these defendants are paying installment payments over time, and the clerk's office is called upon to distribute them pro rata, that the pro rata payments might be, the percentages might be off if they're not adjusted. So does the government have a plan, or what's the thinking there? Yes, Your Honor. To the extent that a defendant raises an objection through whatever mechanisms are available to that defendant currently, we will handle it at that point. I'll note for the court that some of the defendants, in particular, Jason Galanis, whose restitution order was first ordered in this case and then ordered again when he was resentenced, did not object to the amount that the WAC Committee had stated in their victim impact statement, nor did other of the defendants in this case, including John Galanis, whose case is up next before the court. However, and I'll also note that as a practical matter, oftentimes defendants say when they are able to pay back restitution, and in this case that's not clear that any of the defendants will be able to, to your point that it may be moot or academic. When they are able to pay back restitution, the government sometimes settles with those defendants for a particular amount that is then distributed to the victim. And so while there is no ready mechanism necessarily available in each case, we will certainly hear each defendant to the extent that they raise objections or that they want to raise the issue with the government and work to ameliorate any issues. Well, and again, maybe this isn't the question for you, but I'm sure your co-counsel in John Galanis is listening. I will be interested to know, considering that the government raised this issue sort of spontaneously to its credit, even though it had been forfeited by not being raised by the defense in CUNY, I'm wondering whether the government is taking the same approach in John Galanis, considering it wasn't raised there either. But here we are on appeal. Your Honor, we are. In fact, we reached out to counsel from Mr. Galanis, and my colleague Ms. Normalstein can speak to this. But we reached out to counsel from Mr. Galanis, asked him if it is something he intends to raise today. I expect that he will have an answer to that question. But to the court's point, yes, it is an issue that we identified, and we've taken steps to discuss that issue with counsel from Mr. Galanis as well. Wouldn't it be quite simple to have a stipulation with defense counsel that are affected by this, that could be affected by this, and take it back to Judge Abrams and have her just enter it, that the restitution is reduced by $357,000 with respect to the WAP POMI? Thank you, Your Honor. That does seem like a potential avenue for solving this or resolving this issue. Just clear the whole thing up at one time with one fell swoop. Okay. Yes, Your Honor, we will certainly consider doing that. Okay. Counsel, thank you very much. And I think now we will turn back to Ms. Notari. Ms. Notari, you have reserved two minutes, I believe. Yes, Your Honor. And I just briefly want to reiterate that the lot of evidence which the But Judge Abrams is very specific to rule that the mere purchase of the bonds and the fact that Cooney and Archer knew that the object of this conspiracy, they had no reason to know at the time they purchased that their purchase or any of the surrounding evidence would have given them reason to know that this was a criminal object and that this was clearly a legal bond. There were the lawyers for the bonds who testified that many of the actions which the government is citing to were found to be innocuous. They were found to be not criminal conduct. So I encourage Your Honor to review the three categories of evidence that Judge Abrams focused on and to consider that evidence and whether there is a proper finding that this evidence was approximately the cause or reasonably foreseeable to Mr. Cooney as far as the victim and his conduct. I submit that it doesn't meet this threshold. And I further encourage Your Honor to focus on the record and the fact that the district court was very undecided and contradictory as far as making statements as to when Mr. Cooney joined the conspiracy. In fact, she went on to conclude that there was a loss analysis which envisioned Mr. Cooney joining the conspiracy later and she found that that event loss would not account for the $27 million and the loss would not account for the 10 victims and that the loss would be much less. Counselor, he knew that the $27 million was not going into an annuity for the tribe, right, quite clearly. Because he purchased $5 million of that in the second offering and that money was, you know, he purchased those bonds knowing that they were still part of it. It wasn't going back into the, it wasn't benefiting the Wampanoag in any way. And so it's, and the jury found all of this. You know, it's hard to, you know, you're sort of cherry picking little pieces of evidence and asking us to look at those when in fact there was an overall scheme and the jury reached a verdict on your client's guilt. Your Honor, respectfully, there was testimony throughout the trial that he, not only did he not know that Jason Galanis had misappropriated the money that he stole from the asset fund, the cooperator, in fact, who testified, agreed that they didn't know that he was misappropriating the money. Mr. Cuny had no access to those accounts. He was just a person who was a passive investor. He had no insight, he had no access to any of the funds that Jason Galanis stole from. Jason Galanis compartmentalized his conduct to such an extent that no one had a view to what he was doing. The only people who were able to see that were much later, the cooperators admitted that they were able to see that he had done that. But clearly Devin Archer was the second charge of bonds and his conduct was exactly the same as Mr. Cuny. And Judge Abrams found that she exonerated him. There's nothing that Mr. Cuny did with respect to the purchase of the bonds, which was different than what Devin Archer did. And somehow he was exonerated and Mr. Cuny was convicted based on these later acts, which showed some consciousness of knowledge. But that standard, which Judge Abrams relied upon, is not sufficient to show a causal connection between his acts and the loss to the victim. And what I'm asking for your honors is really just to remand this for more specific findings by Judge Abrams to actually make a better record and that there could be clarity in what she means, what her findings were. Okay. Well, thank you very much, counsel. We appreciate both of your arguments. We will take that under advisement. And we will turn to the next case on the docket, which is a related one. Docket numbers 19-619 and 20-395, United States v. John Galanis. So let's make sure I see appellant counsel there. Yes, your honor. And is the government there? I am, your honor. I'm unable to turn on my video. It says the host needs to do it. Okay. We'll ask Mr. White if that's up. There we are. Thank you. The host has stepped in. Very good. So for appellate counsel, can I just ask for the correct pronunciation of your name? Sure. Nobody gets it right, your honor. David Tauger. Tauger. Well, Mr. Tauger, thank you very much. And we can see you perfectly. So if you can see and hear us, I understand that you have reserved one minute for rebuttal? Yes, your honor. Okay. So if you're ready, why don't we proceed? Certainly. Good morning, your honor. If it pleases the court, I represent John Galanis, the petitioner. Here the trial court made counsel very aware that the defense could not argue three things. One, that the appellant trusted John Galanis, Jason Galanis, to be his degree. Two, that appellant did not know that Jason Galanis had a history of engaging in fraudulent activities. And three, that the appellant was duped by Jason Galanis. If counsel made any of those arguments, the trial court stated it would be worth a decision and allow him to fall for a B evidence, namely the so-called Jehovah conviction to come into evidence. However, the court also simply said that counsel could argue three things. The counsel could argue that John Galanis was not involved in the fraud, that the transaction itself was not fraudulent, and most importantly, as it turned out, that John Galanis lacked the requisite knowledge and intent to be convicted of the crime. What the defense was precluded from saying was that John Galanis lacked the requisite knowledge and intent because he was duped by Jason Galanis. It is that argument I never made. The argument put forth by the defense was that John Galanis took the actions he did because he felt he was involved in a legal endeavor and that John Galanis had every reason to believe it was legal because of all the lawyers involved and the major respective law firms, the large respective accounting firms, the publicity companies, and the individuals from the Lafamme itself. The evidence shows there was no reason to think that this was an illegal transaction. Working with Jason was Devin Archer, whose investment company was being run by, among others, Hunter Biden. So why not trust the deal there? For insecurities, certainly not a fly-by-night organization. Greenberg Trapwood, a major law firm with offices all over the country, represented the Lafamme. Stillworth Paxson, another major law firm representing Vernon. They were major accounting firms involved. The argument is now, still has been, and always will be from the very beginning that the evidence demonstrated that John Galanis received no information or instructions from Jason Galanis that were criminal in nature. They never performed any criminal acts and thus did not have the requisite knowledge and intent. In my summation, I did argue that the evidence showed that Jason Galanis was capable of fooling people in this case. But then, directly after that, I listed the people individually, never mentioning John Galanis. No, but you did say he fools his own cronies, and you did say that the prosecution has produced no evidence that shows that John Galanis had any idea or involvement with what his son was doing. And that seems to me to open the door, doesn't it? Well, Your Honor, that's exactly the argument that Judge Abrams said I was able to make, that the evidence did not show that John Galanis had the knowledge and intent. But you went further than that, and you said that what the evidence showed was that the son could dupe anyone. No, I didn't. I said... And then exactly I named the individuals that he duped. Do you want to read the line you said? Because I was under the impression that you said he could dupe anyone. And exactly right after that, Your Honor, I said... But is that what you said? Is my memory correct? I'm sorry, but I don't have the transcript with me at home. I said that Jason Galanis was able to fool each and every person in this case. Yes, that would lead to an inference that that was arguing that he duped his father. Right after that sentence, Your Honor, I said that I named the people that he was able to dupe. I never said that John Galanis was duped by Jason Galanis. As a matter of fact... Well, to the extent that might be debatable, the district court, we would defer to the district court who heard it and understood how a jury would construe it. Don't we? We defer to the district court to abstinent abuse of discretion. But I think it wasn't abuse of discretion because right here, John Galanis wasn't duped by Jason Galanis. By the time Jason Galanis had made up his criminal intent in this case, John Galanis was out of the case. You're arguing the evidence, but I think right now we're trying to argue what you said. What did you say to the jury? And that line said he was able to fool each and every person in this case. And at that point, didn't you open the door? Because as I would understand it, every person in the case means every person in the case. And you didn't go back and say, ladies and gentlemen, I don't actually mean that. I mean only a subset of each and every person in the case. You said each and every person, and then you illustrated with some people. So once you said each and every person, didn't the judge rationally, wasn't she rationally able to say you just included your client? I would believe not because I then listed all the people. Let me ask you, what reason would you have to argue that he duped people other than your client? How would that have served your client's purpose? What it showed was that everybody in this case did not know what was happening. Right. And the purpose of that was to ask them to infer that neither did your client. But for different reasons, Your Honor. But let's move on from that point. Even if the court was correct, what the court did afterwards by allowing the evidence, and then not allowing counsel to call witnesses in surrebuttal was also error. Go ahead. Maggie, no, no. How were your surrebuttal witnesses going to refute the fact of the conviction? Because we have precedent suggesting that surrebuttal evidence has to refute the evidence that was offered in rebuttal. Right. But what the evidence was put in for and used for was to show that John Galatas had a relationship with these people, a criminal relationship, No, I understand how it would have been probative of knowledge and intent. But to the extent precedent says that it has to refute the rebuttal evidence, I'm just trying to figure out how it would have refuted rebuttal evidence that in essence said there was a conviction. Because it would have refuted the knowledge and intent that that conviction is being used to prove, Your Honor. Okay. I understand. So do you want us to change our precedent and allow a more expansive view of surrebuttal, or do you think you fall within the precedent? I think it's somewhere in the middle of that, Your Honor, to be completely honest. I think, yes, I could not rebut. The conviction occurred. There's no doubt about that. That's a fact. I could not rebut that fact. But what I could rebut was the people involved in that conviction and any relationship with John Galatas. For instance, what they showed in that by bringing Gary Hurst involved in that conviction was a false relationship between Gary Hurst and John Galatas. It's accepted by everybody that Gary Hurst never met John Galatas, never knew him, never operated with him, never spoke with him. And this shows a false relationship between those two people that didn't exist at all. And I think that's admitted by all parties involved. But the problem is that it's not a direct repudiation, and there should be no direct repudiation, as you've admitted, of the conviction itself. And now you're suggesting that the court should have abused your discretion in not allowing these other witnesses and having another mini-trial going back to the Genora case. No, it wouldn't have been a mini-trial in the Girova case, Your Honor. The reason we didn't call Jason Galatas in our cases on the defense case to begin with was that if we called Jason Galatas, we knew the 404B evidence would come in, the Girova conviction would come in. Therefore, we didn't call. Jason Galatas had very prescient information to give to the jury in this case. So we made a strategic decision not to call him in our defense case because it allowed in the 404B evidence, which we thought was highly prejudicial. Obviously, it is. I don't think anybody can argue the prejudicial effect of a prior conviction with the people you're charged with doing a crime. The only question is, is it unfairly prejudicial? Well, no, because it was prejudicial. That's why we didn't call him to begin with. But once the evidence came in, Jason Galatas had reason to testify as far as the defense was concerned. He would have testified that he did not send John Galatas to the meeting in Las Vegas, which is the cornerstone of the government case against John Galatas. He would have testified that John Galatas was not involved in the planning of this crime. He would have testified that the money paid to John Galatas was a finder's fee, a finder's fee which many witnesses in the trial said was perfectly legitimate to pay. And that he received no assistance from Jason Galatas in this crime. And the same thing with Raytheon Raines and Stephen Haynes. If we had been able to call those witnesses, actually Raytheon Raines back. Well, hang on a second. Can I just ask, I'm looking at the record, and I think I'm looking at page 4509 of the appendix. And I think, as I read it, the only person you asked to call as a cerebuttal witness was Jason Galatas, right? No, Your Honor. If you go to page, excuse me for a second. If you go to page 4458, which is the initial argument on this issue. I said, I will be putting on a major defense case at that point in time, speaking about if the case gets reopened. Including calling Jason Galatas from across the country here. Including calling Stephen Haynes and many other witnesses who disapprove what they're alleging. I did not mention Raytheon Raines, but I did mention Stephen Haynes in that paragraph. But then when the argument developed before the district court, when the cerebuttal was actually being considered. The only person you proffered evidence from was Jason Galatas, wasn't it? That's correct, Your Honor. All right. I see I've used up my time. I'm happy to answer more questions. Now, you've reserved your minute, so we kept you over a little bit, but you still have your minute of rebuttal. Thank you. And let's hear from the government. Good morning. May it please the court. My name is Rebecca Bermelstein. I represent the government in this court, and I represented the government in the district court below. The district court in this case did not abuse its considerable discretion in precluding cross-examination about payday lending. In admitting highly probative evidence of the defendant's prior conviction. And in precluding the defendant from calling additional witnesses in cerebuttal. The district court's below guideline sentence, which it took into account the defendant's age, health, role in the offense. And the sentences imposed on the co-defendants was both procedurally and substantively reasonable. And the district court's denial of the defendant's time barred and meritless motion for recusal was similarly correct. Let me spend my time addressing the two arguments that counsel talked about just now. First, I think it's worth noting that before addressing whether or not the argument in summation violated the district court's explicit ruling. That the district court's ruling itself was really unduly narrow. Because any argument that the defendant lacked knowledge or intent, not constrained only to being duped by Jason Galanis, triggered the 404B and would have made it admissible. Because under this circuit's precedent, that is taken off the table. A defendant can foreclose relevant 404B only by explicitly disavowing any argument with respect to knowledge and intent. That's this court's decision in Bautista. And so that evidence was admissible even before summation in this case. But I think all members of the panel have acknowledged, even if you limit the consideration to the district court's argument, the district court's ruling. There is simply no question that defense counsel opened the door by arguing that everyone was fooled by Jason Galanis. Everyone on its face includes John Galanis. There is simply no question there. And the only relevance of an argument that Jason Galanis could fool anyone was the implication that he also then fooled his father. There's no question that the door was opened by that argument. And the district court did not abuse its discretion in allowing the government to then put in the 404B that made very clear why it was not reasonable for John Galanis to have trusted or relied on his son. I think with respect to the implication that that was somehow misleading to the jury because it unfairly or inaccurately linked Mr. Hurst to Mr. John Galanis, that's simply unsupported by the record. Mr. Hurst was a defendant both in the underlying Jerova case and in the Wacht-Pomny case. It is true. Mr. Hurst pledged shortly before trial in Wacht-Pomny. And so when briefing this before trial, the government contemplated putting in evidence that all three had been convicted in Jerova. But as is perfectly clear, that is not what actually happened. Because Mr. Hurst had pled guilty, the stipulation put in as the rebuttals case only referenced John and Jason Galanis. That's at page 4563 of the appendix. So there is simply no argument that there were some unfair prejudice by linking John Galanis to Hurst. That just didn't happen before this jury. And I think that it is clear with respect to the scope of surrebuttal that any surrebuttal that Mr. John Galanis wished to offer was clearly barred by the precedent concerning the scope of surrebuttal. I think the First Circuit case in Gaines is the most helpful. But this circuit's precedent itself makes clear that any surrebuttal would have had to attack not the generalized implication of it, but the evidence itself. And it would have had to address an issue that was not already at issue in this case. And that's really the key point here, which is knowledge and intent, as the defendant himself concedes, was the issue in this case. It was the issue from the get-go. And as a result, he certainly understood that Jason Galanis' testimony, if in fact it would have been helpful to him, was always going to be relevant. And the strategic decision not to offer it to avoid the 404B and then to seek to offer it in surrebuttal once the 404B had been triggered is not proper. I will note... Why not? Why not? I mean, I'm trying to look at our precedent through a prism that says both that the defendant has no obligation to put on any evidence, but that he has a right to put on a defense. Now, if he thought that the government's evidence on intent was so weak in its case before the resting, that he wasn't going to call his son because there were a lot of risks attending that. But once you were able to offer the conviction, again, I'm hypothesizing, the defense would think, well, now they've put in something that makes it very difficult for the jury not to find knowledge and intent unless my son testified and said I was kept in the dark about this scheme. Why shouldn't he be allowed to do that? I'm trying to figure out why our precedent would be so strict on this. I think there's good reason for the precedent to narrowly constrain surrebuttal cases as a general principle. Trials are not meant to be an endless round of who gets to talk last. And so as the trial proceeds, the rebuttal is much more constrained than the initial case, and the surrebuttal even more constrained, only to address those new issues that have arisen. And that's the key point. It's not a new issue. The knowledge and intent had been relevant all along. And to the extent that defense makes a strategic decision to limit its case in one way, it does not get a second bite at the apple. You don't get to say, I'm not making this argument. So the whole trial unfolds without evidence that is relevant to that argument. And then at the last moment in closing, you raise a new issue that triggers over. I'm sorry. Please finish. Go ahead. So in some ways, it seems to me your argument is very much tied to the unique facts of this case. We do not have a case where the defendant thought he had removed knowledge and intent from the case. You weren't allowed to offer this conviction evidence, not because it wasn't probative under 404, but because it was deemed more prejudicial under 403. And are you suggesting that that casts the surrebuttal in something of a different light than would have occurred if knowledge and intent had only been put into play by the summation and your rebuttal evidence? I think that's exactly right. I don't think it's limited to a case of legal argument versus evidence. But the point is that surrebuttal can reply to rebuttal evidence only both to directly undermine it and where that raises a new issue in the trial, right? A new issue, not a preexisting issue. And because here the issue was preexisting, you cannot then challenge the implication of the rebuttal evidence by bringing in all kinds of new witnesses. And that's what the First Circuit said in Gaines, right? In that case, the defense called a witness, essentially an alibi witness, who used a notebook with handwritten notes of calendar entries that purportedly corroborated the witness's testimony. They had been with the defendant. In rebuttal, the government then called a witness who basically said, these notations are suspect. You shouldn't trust the notebook. And in surrebuttal, the defendant sought to call a witness, other alibi witnesses, other people who would talk about his whereabouts. And the First Circuit said, no, you can call someone if you want to say, our expert says these are authentic. You can call someone who's going to directly address the government's rebuttal evidence. But you cannot call people who are going to offer more alibi evidence in a case where alibi was always an issue. And I think that's true here. I will note one other thing, which is I don't think it matters because, legally speaking, there was no grounds for a surrebuttal case. But I think it is far from clear that Jason Galanis would have, in fact, offered the testimony that is being provided. I understand that. And I think the district court certainly did not abuse its discretion in declining to allow him to travel from California, where he was incarcerated, to conclude the trial. Well, but that gets into whether maybe there was needed to be another step before she ruled on that ground, right? That there would have had to have been a request for an affidavit from him or something like that. I think that may be right. And certainly, this court doesn't need to reach that issue. If there aren't any other questions. I have a question relating to the argument in the preceding case. When we talked about the restitution point, the restitution was awarded against John Galanis. Am I correct on that score? You are, Your Honor. And Mr. Galanis did challenge the restitution order more generally in the district court, alleging that he lacked the foreseeability into the full amount. He didn't challenge this particular element. But because Mr. Galanis is on appeal, the government does not object to any modification made with respect to Mr. Cooney being made with respect to Mr. John Galanis as well. The $357,000 is what we're talking about. That's right. The so-called expectation damages that the tribe was claiming. That's right. Yeah. Okay. Very good. Thank you. And let's go back to Mr. Talbert. You have one minute reserved for rebuttal. Thank you. Getting back to Judge Radley's question. In United States v. Sorensen, also citing United States v. Murray, surreptitial evidence occurred where, one, the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case. And, two, the defense's proper surreptitious testimony is not tangential but capable of destroying the essence of the government's rebuttal testimony. Here, we're putting it to the evidence of the Eurova conviction certainly broadened the government's case against John Galanis. It was a whole new avenue brought forth that John Galanis had a criminal record. Now that he had a criminal record, he had it with his son, Jason Galanis, who was the main cog in this case. I don't think anybody's going to argue that. And with another individual. Excuse me, Gary Hurst. So, there's no doubt that under Sorensen, we've met level one. And then level two, there's no doubt also that the testimony would have been capable of destroying the essence of the government's rebuttal testimony. Because Jason Galanis, who did submit an affidavit to the court post-trial stating all of what he would have testified to, which is what I outlined earlier, it discredited much of the evidence, the scope of the case once the rebuttal evidence was put in before a court hearing. It's similar to the case where, I never argued that, it's similar in the fact, it opens the door, I should say, excuse me, it opens the door because the case became expanded. There was a whole new avenue of evidence put in. And the evidence we suggested would have contradicted that evidence. Thank you very much to both of you. Very helpful arguments. We appreciate it. And we will take the case under advisement. Just to answer Judge Walker's question, we do concede and stipulate that the government's changing the restitution order. Very good. Thank you for that. We appreciate it. Again, thank you. Let's turn to the next case on argument schedule today, which is Milberg LLP versus Drahwa Limited, 20-2500. Let's see. We have counsel here. Mr. Dayhill for the appellant. Yes, good morning, Your Honor. And Mr. Ostlander for the appellee respondent. We can't hear you, Mr. Ostlander. Just make sure your microphone is working. How about now, Your Honor? Perfect. Good. We just want to make sure technically we're all set. So, Mr. Dayhill, I have it noted that you would like to reserve two minutes for rebuttal. Yes, Your Honor. Thank you. So, I think we are ready to proceed, Mr. Dayhill. Thank you. Good snowy morning to everybody. And may it please the court. I am William Dayhill from Dunnington Bartholomew Miller and counsel for the petitioner appellant Milberg LLP. Milberg seeks reversal of the ruling below, which dismissed the petition to vacate an arbitration award with prejudice, because, one, the court misapplied pleading standards to dismiss the petition to vacate based on an alleged insufficient diversity jurisdiction pleading. And, two, the court below ignored inter-carbon and myriad cases following it. When the court dismissed the petition to vacate for untimely service beyond three months, which is a misapplication of a statute to service on a foreign respondent when the statute does not address service and, therefore, timeliness for a foreign respondent. Respectfully, the court should reverse the court below remand so the petition to vacate can proceed to the merits on summary judgment as contemplated by the FAA. Now, I'm prepared to address both those issues, but was, with the court's permission or was acceptable, was going to start with the timeliness issue. The court below erred, as I mentioned before, because it purely ignored inter-carbon. And the court below applied 9 U.S.C.E. 12 to a foreign respondent as if that was a clear-cut choice to be made in this particular case. Respectfully, the court should have considered the factors first addressed in the Southern District opinion of inter-carbon 1993, which has been cited routinely by courts since then, which looks at the unique circumstances of arbitration, fairness, notice, particularly where, in a case like this, there's clear-cut jurisdiction over a pardon. I'm going to jump in a little bit ahead of the six-minute mark, and I apologize for that. You talk a lot about inter-carbon, but it's a district court opinion, right? It's not binding on us? A hundred percent, Your Honor. That is correct. Could you perhaps focus our attention, to the extent you think that there is, on the binding precedent, that of the Supreme Court or this court, that would actually potentially constrain or guide our decision? We understand, certainly, that inter-carbon may perhaps be persuasive, and that's fine. But could you just lead by telling us, what are the boundaries of precedent, aside from where you'd like us to go? What are the guideposts that, by things that bind us? Well, I would say, Your Honor, we've not found anything within this circuit, nor at the Supreme Court level, to the extent you're asking, dealing with this expressed issue. The only circuit court that we've seen that has addressed this issue, and again, this would at best be persuasive, is the D.C. Circuit, which itself doesn't deal with any of the issues raised in inter-carbon. Can I perhaps direct your attention to, and I'm probably going to get the name of the case wrong, but I think it's something like Flores-site, is that how we pronounce it? The Second Circuit decision, which is a little bit different from some time ago, but it seemed to suggest that the three-month deadline in Section 12 is binding, and I think there was language to the effect that there is no common law exception, that this is a creature of statute, and therefore, we are not to apply any common law exceptions. So would you just address Flores-site and how that, in your view, why it applies, why it doesn't apply, or is it not relevant? I would argue that it doesn't apply, it's not relevant, because it didn't deal with a foreign respondent. It dealt with all of the cases that are cited by the court below, as well as by the respondents here, deal with precedent, that deal with the specific circumstance of a domestic service on a domestic party. Why does that statement that it made, that there is no exception under the common law to this binding three-month deadline, what is it that makes a foreign respondent not fall within that statement that we made? Two reasons, Your Honor. Number one, because the statute itself doesn't speak to service on a foreign respondent, it only speaks to service within a district, whether the district in the court sitting or a district within the United States. In fact, that statute itself also still contemplates U.S. marshal service, so it is somewhat out of date. Pause there to make sure I understand your argument, Brian. You're suggesting that because the service of process method part of Section 12 could not apply in any conceivable world to a foreign respondent, then the whole Section 12 itself goes out the window. In other words, the three-month deadline also goes completely out the window when you have a foreign respondent. That all of Section 12, by definition, is now inapplicable? Your Honor, the argument, the position we take is that what needs to be taken into account in the facts of a particular case, looking at what the foreign service says. Help me with the statutory construction argument first, though. Because, again, if you have Section 12, I understand your argument that the two sentences about method of process don't apply. And I thought you were then arguing that if those sentences don't apply, the first sentence similarly does not apply. Excuse me, Your Honor. Yes, I am making that argument because of this. In your view, is there no deadline? No, Your Honor. It would have to be construed in a manner consistent with the idea of providing, at minimum, notice within the time period or as close to the time period that's set aforth in the statute as a guideline. In fact, if you look at the cases that apply, the concepts found in inter-carbon, including inter-carbon itself, there is at least notice within the time frame contemplated by the statute. So I wouldn't suggest throwing the whole statute out. So you're suggesting that the first sentence of Section 12 does textually apply to foreign respondents because it says that notice must be provided within 90 days? Well, it's within three months. But it's also – well, it did make a difference, and it makes a difference in this particular case. No, the argument, Your Honor, is that the statute speaks of notice – that service of notice of motion would be made within a three-month time period. What I'm stating instead is that, literally speaking, that sentence cannot apply to a foreign respondent because where, for example, you have hate convention service, it's impossible within three months. It just literally is impossible. And the facts of this case demonstrate that as well. So the argument that we would make is that if the statute needs to be given at least guidance, it doesn't address the foreign respondent. But rather than ignoring its entire text and say, well, there's no rules that apply to a foreign respondent, we would argue that if you look at the fairness concept that is addressed in inter-carbon, the reasonableness of notice and lack of prejudice, one could still determine whether or not that the statute has been met for commencement purposes. I guess I'm having trouble understanding. So you're saying that we should apply, I guess, for lack of a better word, the spirit of the statute. You're saying that because the words of the statute cannot be complied with, the spirit, we're supposed to somehow discern its ineffable essence. Well, I hope I can give a better response than that. It wasn't a very charitable. No, no, no. May I ask just a few questions about how this all played out? Sure. Where were you in the three-month process when you first filed your action to vacate the judgment? Where were you in the three-month period? We were on the three-month deadline. The last day, right? That's correct. Why should a court be tolerant of your difficulty in serving when you wait until the last day to file the action? And in filing, do not, at that time, while you were still within the three-month period, at that time, seek an adjournment. I mean, there are any number of circumstances where courts will entertain adjournment applications made within a time for filing, but not after it's run. Well, actually, Your Honor, first off, there actually is clear precedent that the time period, again, our argument is it doesn't apply, but the time period cannot be extended. So that we look clearly at that, number one. But you sought an extension. You sought and obtained an extension from the district court, right? Yes, but I would note that it came up under a different circumstance. We filed the action. The court issued an order the same day directing that service be made within 21 days. So it was already directing service be made outside of the three-month time period. We noted back to the court that in this case, since we had foreign respondents, it was not possible to serve within 21 days. That we would need additional time because of the hate convention, which eventually we got. Well, not right away. First, you approached defense counsel or you approached counsel for your adversary and asked them if they were authorized to accept service, right? We did, Your Honor, in the hopes of avoiding... And that's when you went to the district court and asked for an extension, or do I misunderstand the chronology? Respectfully, I think there's a slight misunderstanding. So the very first thing that happened, the court issued an order, one, saying correct your jurisdictional pleading to make it more clear. Number two, this is the schedule upon which you will effect service within 21 days. At that time, we had already made the request to the defendant, to a respondent, to accept service. They declined. And at that point when they declined, we were still within the 21-day period that the court had set. We advised the court that either we, A, need an extension of time beyond that which the court had set to serve, or unless the service on the email to counsel was deemed effective service. So the purpose of needing the extension was because we could not meet the hate convention service in 21 days. But, again, I want to emphasize, we were already beyond the three-month time period when the court was, in our view, operating consistent with InterCarp and because there was not a discussion about whether or not we needed that time in order to meet the three-month time period. It was talking about something separate. Can I ask a question? You make a number of assertions throughout your brief that the amount of time it took you proves that one cannot serve notice through the hate convention within three months. And as far as I can tell, you seem to say because it took us four months, it could not have happened faster. I was trying to look through the record and it looked like a number of the defendants were served on July 5th and a number later in July. What wasn't clear to me was when you transmitted to the central authorities of Germany and Luxembourg the request for service. I don't recall. I can tell you it was by the end of May because if you look, there's an order by the court that permitted us, I think it's on May 22, to shrink the number of documents that needed to be translated. So, therefore, it went out promptly thereafter. The question then is, was most of the time then eaten up by translation? And if so, you know, I mean, after this is perhaps getting more into the weeds than I need to, but it is subject to some curiosity to me. You know, after service was affected, for example, on July 5th, you know, you didn't file something on the docket until September 22nd. Was that a delay in returning the proof of service to you? Yes, Your Honor. So the way I understand it, the service was affected at different parts of July in Germany and Luxembourg. But at that point, all that does is then the proof of it goes back to the central authority. The central authority then prepares the papers that basically report that the service has been completed. Those papers then need to be translated. They were sent back to us and they were filed. So, yes, it may have been that a delivery was made in July in Germany. We didn't get the papers back to file on the docket until September. I want to go back to what Judge Nardini asked earlier. Assume we were to rule in your favor. What would you like our opinion to say about this, about the three-month period when it comes to foreign defendants, foreign service? The way I would anticipate it, because I would have asked me the same question, and the way in which I would articulate it, Your Honor, Judge Walker, is whether under the facts, a foreign respondent is given prompt notice, is already subject to clear jurisdiction, is not subject to prejudice, there's been no effort to delay by the party who's the moving party, and the three-month period cannot reasonably be met. I realize there's a lot of moving parts there, but that's the way I would articulate it. One question I have then is your efforts to affect service prior to the time that you called the attorney for the opposition and asked for that attorney's authority to affect service, to accept service. What had you done prior to that? How do you meet your own criteria that you just outlined of prompt due diligence and effort on your part? By providing the notice to them within the three-month time period provided in the statute. In fact, you provided notice at the end of the three-month period, right, the last day? That's correct. And it was after business hours. So there's no way that service could have been complied with, even if it had been domestic. It was just everything was way too late, wasn't it? Respectfully, Your Honor, the reality is we have a 33-page opinion, arbitration, or substantial time was spent determining whether or not to proceed to prepare the papers to pull the trigger to go ahead and do this. Yes, candidly, if what you're suggesting is could we have an advance saying, look, we're planning on making a motion, will you accept service, we didn't do that. But realistically, that's the process it took us to get to this point. I'm not sure the record here is the most favorable one for you of what happened on your side in terms of asking for relief here. One can see how the three months would be constraining as to a foreign defendant. But on the other hand, one would have to, I think, make some kind of showing of due diligence and reasonable efforts to effectuate the service prior to the end of closing business of the last day of the period. The other thing I'll add is it appears, again, from what you filed on the record, that service was effectuated within about two months. Now, it took longer for you to get that proof of service back. But if the latest, I think, was a July 29th service, and a lot of those folks were served on July 5th, so it looks like actually the Hague Convention is not quite as dramatic as you make it out to be in the sense of always and everywhere taking longer than three months. It looks like in every instance service took less than three months. Now, it took longer for you to get the paperwork back and get it filed and prove to the satisfaction of the court that you did meet the three-month deadline. But it looks like you did, well, that it took less than two months. I think, again, Your Honor, I think there was nothing available to us, to my understanding, and I don't want to go beyond the record too far. But to my understanding, just because the delivery was made didn't end the process even under the Hague Convention. Even before us getting the paperwork back, the paperwork had to go back to the central authority. The central authority then prepares its report, which then gets sent. Right. My point being that later, and maybe it would have taken until September, that you could have said to the district court, okay, now I have proof that I served notice of this within three months. But can I go back to a completely different issue? And I know we're keeping you beyond your time, and I apologize. I appreciate the opportunity. Which is the diversity allegations. Yes. It took you a long time, or your party, I don't know about you, but it certainly took the Milberg a long time to get its diversity allegations straight. And even when you didn't, when you got to try number three, I mean, there's still some ambiguity there. It's like are or were. And I have to say that when I read that, I'm not sure what Milberg means, that they are, or maybe some of them are and some of them were, or some of the partners or other of the partners. And it seems like that was, I mean, this isn't this, I come from a criminal background, so I don't know how easy or hard it is to allege diversity, but I would have thought this is pretty easy. You say at the time we filed, the partners were A and B. A was a citizen of New York. B was then a citizen of Iowa. Done. Yes, Your Honor. Although I also believe a fair reading of the allegation in the third effort, as you've noted, is it also reads that all relevant times partners were citizens of the state. I know it says, no, there's a disjunction. I realize there's a disjunctive and a conjunctive would have been better. But I think what the argument I have with regard to the district court's interpretation is that what rather, putting aside whether the appropriate pleading standard is its motion standard or pleading standard, the court in this particular case would believe read a negative inference into language. Well, I think that what's curious is the district court took the view that the person who filed the declaration, who was of counsel to the firm, though, with longstanding ties, that it wasn't clear he had personal knowledge. And so I guess what's curious is on the third try, why didn't you just let the partners submit something as to their residency? The simple answer is, Your Honor, I'm working with my client and made a request. Right, but you understand that the court, now we have to deal with whether the court erred in having enough questions about the submission to conclude that you just hadn't satisfied it, hadn't satisfied jurisdiction. Tell us why we shouldn't reach that conclusion. Your Honor, I would point to the Van Buskirk case, which makes reference to and utilizes 28 U.S.C. 1653, which permits defective allegations of jurisdiction may be amended upon terms, if it appears, at the trial or appellate court. That doesn't say third to fourth time. I mean, that's the concern here. There comes a point at which we recognize the district court has given the parties a chance and can say enough. I mean, I don't think the case you cited involved two prior chances to clarify this. Actually, the case actually involved what was explained in the opinion to be blurry photocopies of licenses and other things which caused questions of the veracity of what was being said. Here, there's been no demonstration or suggestion anywhere that there somehow is not the jurisdictions here, whether it's not been pled to the clarity that the court has asked for. Nonetheless, there's not been any basis to doubt that we can create jurisdiction. The question is, I'm not seeing it clearly enough under those courts and the standards of 1653, because jurisdiction has always existed. I'm not sure if Judge Nardini. Judge Nardini. You heard enough from me. I'm going to email the judge right now. We're going to get it. Just bear with us. We're going to get it. Okay. Okay. Okay. I'm noticing in the emails that Troy White's laptop froze. Judge Nardini has said that his Zoom has dropped. Yeah. I assume he's trying to get back to us. That is correct, Your Honor. Just the images for me froze. I have been able to still go forward, but I'm trying to contact the judge now. IT maybe call him also, because it's ringing now, so we should be up shortly. If it doesn't work out, we might consider oral argument. I mean, just do it by audio. Okay. I apologize. I seem to have had some Internet outages due to the Blizzard here in Connecticut. I apologize. I don't want to keep anyone any longer than necessary. Were we on pause or did people continue to chat? I made the most brilliant few statements, actually. I'm sorry. Following up on your earlier remarks, yes. Actually, I don't know that there's anything. I'll answer more questions or if you want to pass it over to Mr. Auslander. Whatever the court prefers. That's fine. We move to Mr. Auslander. Again, I thank you for your patience. May it please the court, Jay Auslander for the appellees. I think I just want to begin by saying that if we could sum up the arguments on this appeal and what this appeal is, I think we could say that it's too little, too late, and unprecedented. And I'll start with too little. And I'll begin with diversity since that is where we left off. The first petition here was filed on May 6th. And the last attempt to cure that petition happened over six months later by the declaration of Michael Spencer in December. So there was a six-month period. In that six-month period, the first petition was diversity and federal question. The district court the very next day said you're going to have to give me more on diversity, among other things, or I'm going to dismiss this pleading. And so on May 9th, they came back and they filed the second petition. And in that petition, Milberg alleged that it was a partnership of one with a citizenship in New York. Partnership of one is not a valid partnership under Section 10 of New York's partnership law. And so then on October 11th, after there had been some various communications with the district court, they came back and they said, well, we actually have two partners who were or are citizens at all relevant times. And then on the dismissal motion, Mr. Spencer, who only claimed to be fully familiar with the workings of Milberg and the citizenship of its partners, submitted his affidavit rather than his declaration, rather than Milberg submitting a declaration, for example, of the partners who had actual knowledge of when they were citizens of New York at the time of the commencement of the petition. So let me ask you, counsel, pleadings of diversity, like pleadings of the claim, only have to satisfy a plausibility standard. When an individual who has been with the firm for many years pleads that or asserts in a declaration that two partners were or are United States citizens at the time of the, at the relevant time, which we assume the relevant time is the filing, why isn't that a plausible pleading of diverse jurisdiction? Because when it comes to pleading diversity, first off, the case is, the law in the circuit, is that inferences, we don't give the inferences to the pleader. The pleader has a burden of affirmatively demonstrating that citizenship. I'm not asking for an inference. He pleaded that they were citizens at the relevant period. Well, he pleaded that they were or are at the relevant period, rather than at the time that the petition was served. And what I would say- Well, that is the relevant period. That is the relevant time. Now, if he was mistaken about that or something else were to emerge later on, but this is the pleading. Why isn't it plausible that therefore he satisfied diversity jurisdiction? Because when we look at this particular declaration, and I will say this, Your Honor, for argument's sake, I have been a partner at my firm for almost 20 years. I've got lots of different partners, and I can't tell you that I know what the citizenship is. Mr. Spencer, when he put in his declaration, instead of saying, I know, he just said, I'm familiar because I've been involved with these people, and I know them. That's not enough to even come up, especially after six months. And especially one other point, after the district court six months earlier said, you've got to allege the citizenship of Milberg in its entirety. So Milberg was told exactly what it had to do six months earlier. And on its fourth effort, it comes back with a declaration by somebody who doesn't say he knows. He puts in a declaration. So he wants it to have evidence. Otherwise, you don't need a declaration. He puts in a declaration. He says, I'm familiar with my ex-partners or my partners, and I'm familiar with the firm because I've been there forever. And so they were or are citizens. The district court properly, after a six-month period of asking Milberg to get it right, and it's not difficult to get it right. And pleading diversity of a limited partnership means you plead the citizenship of each partner. And in fact, the district court told them to do that on May 7th. When you factor all of that in, and you look at the months that passed, and the numerous attempts, and moreover, Your Honor, remember that they started off claiming that it was diversity and federal question. Then they dropped federal question. Then they said they had one partner. Then they said they had two partners, who were or are citizens of the state. The district court wanted more after six months, given the vagaries of the pleadings that had come before, given the differences and the different statements that had come before. And this declaration, typically a declaration, right, would be by somebody having knowledge. This declaration on a motion, it wasn't the petition itself. It was in opposition to the dismissal motion. It was a declaration not on personal knowledge. And it would have been simple for them to put in declarations by the people that had personal knowledge, or that knew, or even somebody that could say, I know because I'm his next-door neighbor. But none of that is there. Counsel, can I just ask, if we had any marginal qualms about the subject matter jurisdiction, the allegations, but if we were to ask Mr. Dayhill on his rebuttal to just repeat what he said in the blue brief, which is, look, we got these two partners at the time of the filing of the petition. They were citizens of the United States. If we were to exercise their discretion, you would agree that we would be allowed to allow them to make a filing supplemental here on appeal, and it could clear it all up, right? I would never. We have that discretion. You may not want us to exercise the discretion, but you would agree that we have the power to do that, right? I would never attempt to limit this court's power, but I would say is that if the court were going to exercise its discretion, for example, under 1653, it should do so in a case that warrants it. And where you have six months to really, I mean, let's face it, this isn't esoteric. And I think Judge Nardini, you were right when you said it earlier on, and you talked about where you were coming from a criminal background, you know, but it seems fairly easy. It is fairly easy. And that's why the district court the day after they filed the first petition said, hey, look, you have to allege the diversity of all of the citizens. Do it or I'm going to dismiss it. And it goes on and on through multiple iterations of conflicting statements. It's one partner. It's two partners. Then there's are or were in the disjunctive to exercise that power that the court has, to exercise that discretion. The court under the cases under 1653 would be looking for extenuating circumstances that would say, well, we're going to go out of our way here to allow this to be rectified. Those circumstances don't exist here. Can I ask you, because you only have a couple of minutes left, would you mind spending a little time on the question of timeliness? And let me just pose a question to you. When you look at cases like Flores sites or however you pronounce that, which talk about there being no common law exceptions, you know, that case, of course, was about the timeliness of raising a defense to a motion to confirm an arbitration decision. Right. There are lots of cases, particularly from the Supreme Court since then, saying that we presume this is the Supreme Court presumes that when Congress enacts a statute of limitations, it does so against the background that equitable tolling will apply. Unless Congress affirmatively says something to the contrary, make clear that it doesn't. So I guess what I'm wondering is given that Flores sites seem to be dealing with a particular issue, which was what's the deadline for raising a defense against confirmation? Is that language about no common law extensions really dicta? And would we be obliged to then follow the Supreme Court's pretty consistent rulings that equitable tolling applies unless Congress speaks clearly contrary? And are we then potentially in a world where I suppose your best argument would be even if equitable tolling applies, your opponents don't deserve to get it because they waited for the last minute, etc. Yes, Your Honor. I would say a number of things. First off, I think the court in Florestan, which has subsequently been followed by this court in the Wallace case, and then applied by the district courts uniformly very recently in the Triumph case in 2011, in Anglin in 2017, in Marshak and Vector in 2020. I would say that that ruling about Section 12 actually applies and is a holding itself about the statute saying, look, the whole idea of petitioning to vacate an award is a creature of statute. That's what it is. That's why there's no common law exception to it. And that is why this court in Florestan specifically said there is no common law exception to the three-month limitation period. And that is, and then of course Anglin and Triumph and the other cases in different fact patterns have discussed Section 12 as being strictly construed and not subject to equitable tolling and even absolute. And that is, of course, what the case says. I think that it is not. I think that is how Section 12 is deemed to be because it's merely a creature of statute and not a creature of the common law. I think you're right. I think there's something in the record, though, that I'd want to address. It isn't that they actually went ahead in this case, even if the court were to assume that it should apply some equitable deference in certain instances into Section 12, which is not thus far the law in this circuit at all, with no exceptions. There are none thus far. But even if the court were going to do that, this wouldn't be the case. Not merely because they served, or I should say not because they served the petition on the last day of the three months. They actually served it on the day after the last day of the three months because Rule 6 under Anglin, for example, says that you actually start the counting on the day of delivery. So the last day would have been May 5th, not May 6th, when they served the petition. But even if you were going to assume again, so now assume equitable tolling should apply, and now assume it's May 6th and not May 5th, well, as Your Honor and as the court pointed out earlier, there was no reason, none in this instance, why they couldn't get the service done. Your Honor pointed out that they appeared to have effected service under the Hague Convention by July. In fact, they first were able to do it on June 28th. And they first told the court that they were considering Hague service on May 14th. That's long past even their view of when the last day is. So even if you accept their view, which cuts against Anglin, that the last day was May 6th and not May 5th, they didn't even consider Hague service until May 14th of an award, to vacate an award that they got on February 5th. So they're well beyond it. If they were considering it on May 14th, and they did the first service by June 28th, it's hard to imagine an argument that Hague service within three months would have been impossible. It also defies credulity that if you really thought that, make an application to the court early on under Rule 4 and see if there's some substitute service that the court would allow. Nothing happened. At the very best, as the district court said, at the latest, nothing happened until May 6th. We say that's one day too late under those cases that we've cited. But even if it isn't, they waited until 9.53 in the evening on May 6th to ask if we would accept service? There can be no question that they didn't start drafting the petition on May 6th. So at some point, they could have reached out to us. They could have attempted service. They could have gone to the court. They could have done something. And frankly, they certainly didn't have to wait until May 5th or May 6th. So, A, I think fluorescence is binding precedent. There is nothing that cuts against it. The district courts, since fluorescence, have uniformly, in cases not related to the method of service but to timeliness, have applied it quickly. And even in the words of, I believe it was Amlin, absolutely. And here, there's just no equitable basis to go ahead and to say that Millbrook can go ahead, fix its jurisdictional pleading after four attempts over six months after it was warned, basically on day one after it filed, that the court would dismiss the petition if they didn't get it right. And there's no reason to go ahead and apply equitable tolling to Section 12 when they waited beyond the last day to even approach us and until May 14th, which even they would admit is a week past the last day, to tell the court that they were considering paid service. Equity doesn't require overwhelming indulgence. Equity is based on fairness. And equity certainly shouldn't be based on a willingness to be blind to a party's requirements that it failed to adhere to time and time and time again over months. That is, I hope that answers your question. Okay. That does. Thank you very much, and we appreciate that. Mr. Dayhill, I believe that you have reserved two minutes for a rebuttal. Would you mind, Mr. Dayhill, you're on mute. Could you unmute yourself? Sorry about that. Yes. Would you be able to just begin? I have no idea whether we are inclined to do this, but if the court were to decide that we wanted to give you one opportunity before us to amend your subject matter jurisdiction, your diversity allegations, would you be prepared to send us something in, I'm going to make this up, within a week, that contained first-person affidavits of the partners who were the partners at the time of the filing of the petition, saying we are the two partners who were the partners at the time, and we are citizens of, you know, whatever, Oklahoma, and I'm going to do that. Is that the sort of thing that you'd be prepared to do? 100%, absolutely, Your Honor. You know, we would undertake that. The only reason I can't speak to timing is because I don't know where people are, but we would make that effort and don't see why that couldn't be done, and would appreciate that opportunity to address, you know, the circumstance. One, you know, thing I know with regard to, you know, Mr. Auslander and talking on the jurisdictional point, you know, I can understand that he's kind of expressing an idea of the court perhaps is fed up, but I don't know that being fed up as such is enough to distinguish a right. I think there's never been a bona fide question as to whether there is, in fact, diversity here, and counsel has never said differently, and an opportunity to provide additional support directly dealing with the issue from the two individuals, Ms. Tadler and Mr. Phillips, providing that they were citizens of the United States at the time this was commenced back in the beginning of 19. We would do that and welcome that opportunity to address this course. But if we assume that, even if we assume that, we'd still be left with the service question, right? That's correct, Your Honor. That's only one of the two. Your adversary talked about why equity would not intervene in this circumstance. Is it indeed equity that you have to appeal to here? Well, actually, the idea of equitable extension of the statute of limitations actually is not really the way in which the cases that we've relied upon focus on it. What they talk about is, but they do use the word fairness, which of course is an equitable principle. But the terminology that's used is whether or not under the circumstances it would be fair where the party has notice. That's not an appeal to equity. I'm just asking whether you have to basically demonstrate that the district court's actions here were inequitable. Your Honor, my response would be that we had a 33-page opinion. We had determinations to make as to whether to move or to appeal, the basis upon which, and under no circumstances could it be suggested quite candidly that all of that can be done and do Hague Convention service within the time period of three months. It's just not feasible. I do know, by the way, that the June 28th service was done outside the Hague because it was a party in Lichtenstein. It wasn't under the Hague Convention as one of the many parties. But under the circumstances here, a party who appeared in New York in this arbitration, the party who was represented by the same counsel before that arbitration, during the arbitration, and here today were provided within three months the notice that we are moving to vacate this. The fact of whether or not it needs to be translated and we go through the hoops to try to serve this shouldn't be held against, given the fact that the three months in the statute doesn't reasonably apply to a foreign respondent. The answer is that what's inequitable would be for the respondent here, again, having participated, agreed to jurisdiction in New York, participated in arbitration in New York, then saying, well, you weren't able to serve me my proper service in Germany and in Luxembourg. Therefore, you don't get an opportunity to rehear your petition to vacate. That's the way in which I think equity would balance the equities in our favor. Well, thank you both very much. Very well argued, very helpful arguments. And we appreciate your patience with these technical challenges. We will take the case under advisement. I'll also note that there are two other appeals calendared for today that are on submission. That's 19-4184 and 19-3425. They are also taken under advisement. And we have one motion on today's calendar, which likewise can be taken under advisement. Before we adjourn, I would like to thank not only the parties, but also the clerk's office, Mr. White, and the wonderful IT staff of this court for making today possible under the challenging circumstances. We are certainly grateful to all of them for their wonderful efforts. So with that, Mr. White, I would ask you to please adjourn the court. The court stands adjourned.